IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2024

IN RE EZRA C.[1]

**Appeal from the Chancery Court for Putnam County**
**No. 2022-12-A      Ronald Thurman, Chancellor**

_____

**No. M2023-00927-COA-R3-PT**

_____

This action involves the termination of a father's parental rights to his minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish the statutory ground of termination of abandonment by failure to visit. The court also found that termination was in the best interest of the child. We affirm the trial court's termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S. and JEFFREY USMAN, J., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Darrius C.

Dana R. Looper, Cookeville, Tennessee, for the appellees, Laura and Philip G.

Casey D. Brown, Cookeville, Tennessee, guardian ad litem for the minor child, Ezra C.

**OPINION**

**I.      BACKGROUND**

Ezra C. ("the Child") was born to Laura G. ("Mother") and Darrius C. ("Father") in June 2016. Mother has consistently maintained custody of the Child since birth. Father resides in Pinson, Alabama, with his wife, Victoria C. ("Stepmother"), while Mother resides in Baxter, Tennessee with her husband, Philip G. ("Stepfather"). Pursuant to

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

agreement, Father exercised six weeks of consecutive co-parenting time in the summer months, one week during the Christmas holiday, five days in the Spring, and additional visitation when Father was in town, dependent upon him providing advanced notice to Mother. Father was also tasked with remitting child support on a monthly basis.

The Child was under Father's care and supervision when Mother retrieved him at their meeting spot in Chattanooga, Tennessee on July 17, 2021. Mother traveled with the Child to Nashville for an event. Upon their arrival, she noticed bruising on the Child's buttocks and legs. The Child disclosed that Father spanked him with a belt. He also disclosed that one of his step-siblings touched his penis.

Mother took the Child to a hospital in Nashville for a medical evaluation. The hospital documented the bruises, and Mother filed for an emergency protective custody order. The parties entered into an agreed order, dated September 1, 2021, whereby Father was limited to two weekly video calls and supervised visitation with the Child through Insightful, a Family Care Coordination and Advocacy program in Tennessee. Meanwhile, the Tennessee Department of Children's Services ("DCS") investigated the allegations of abuse. On January 26, 2022, DCS notified Father that its investigation revealed that the allegations of child abuse were unsubstantiated.

On February 16, 2022, Mother and Stepfather (collectively "Petitioners") filed the instant action, petitioning for the Child's adoption by Stepfather and the termination of Father's parental rights based upon the following statutory grounds: (1) abandonment by failure to visit; (2) severe child abuse; and (3) failure to manifest an ability and willingness to assume custody of the Child.

The case proceeded to a hearing, held over the course of two days, beginning on December 21, 2022, and concluding on April 25, 2023. Father recalled that the Child arrived for visitation in May 2021 with a mark over his eye and some other small bruises he likely obtained from running and jumping around. He denied knowledge of the Child's bruises on the morning of July 17, 2021, stating that he assisted him with a shower and did not notice any bruising at that time. He agreed that the Child shared a room with his step-brother, who was seven years old in July 2021, but denied that the Child was ever touched inappropriately while in his care.

Father described a loving relationship between himself and the Child, claiming that he has always been involved in the Child's life, whether on a daily basis or through regular visitation. He sought to return to the original visitation schedule and to resume his relationship with the Child. Father acknowledged that he has not sought any treatment relevant to the allegations alleged against him and that he has also not sought to modify the visitation agreement.

Father did not visit the child between July 17, 2021, and October 25, 2022, despite the fact that he was present in Tennessee for court hearings and related matters on August 10, 2021, and August 31, 2021. Father explained that the Child was in school during that time. He claimed that he visited via FaceTime at least five times during the pertinent time period, but he only provided documentation supporting one such visit in November 2021.

Father was employed by the Tennessee Department of Corrections with a net monthly income of $2,500, from which he paid child support, leaving only $1,700 per month. He also started two businesses, a car rental company and an exotic animal business, purchased a home in May 2022, and an SUV for his wife in August 2022. He claimed that his businesses were not profitable and were no longer operational. He agreed that his wife also contributed income for the family to cover their expenses and that he had obtained a business loan in 2021 that was in excess of $20,000. He admitted that he included a $50 per month gym membership in his expense report and allotted $100 per month to unspecified "recreation expenses." He further agreed that he paid for the family, including the Child, to enjoy a vacation to an amusement park in Florida during his visitation in 2021.

Father asserted that he was unable to afford the fees and related expenses for visitation. He provided that the visitation fee was $300 for a four-hour visit and that his related expenses included finding childcare for his other children, $200 for gas to and from the visitation, $160 for two nights in a hotel room because the visitation site was four hours away, and time away from work with lost daily wages of approximately $216. He estimated that each visit would cost approximately $876.

Father testified that he visited the Child on October 25, 2022, eight months after the filing of the termination petition. He recalled that the Child referred to him as "Darrius stepdad" but that the visit was "smooth." He stated that they talked, played games, and that the Child was having fun throughout the visit.

Harli Langford, a DCS employee, testified that she received a referral for the Child in July 2021 for possible sexual abuse and physical abuse. She made initial contact with the Child on July 20, two days after the disclosure of abuse. Following the initial contact, the Child was referred for a forensic interview. He was unable to follow the model for the forensic interview. Ms. Langford then completed an additional interview sometime in August 2021 at the Child's school. She stated that at that time, the Child did not disclose any allegations of sexual abuse. However, he disclosed that Father took his clothes off and spanked him with a belt while under Father's care for summer visitation. She did not observe any bruising or marks on the Child at the time of the interview in August; however, she viewed the pictures provided by Mother that depicted bruising. She described the bruising as follows:

> The bruising on his legs and buttocks were in a linear shape, pretty defined, and did not appear to be [caused by] childhood play, you know, marks and

bruises that we commonly see on lower legs, usually below the knee, of playing.

She continued by stating that she found the bruising "concerning."

Ms. Langford disclosed the physical abuse to the proper authorities in Alabama for a further criminal investigation. She classified the physical abuse as "substantiated" and the alleged sexual abuse as "unsubstantiated" for DCS for the purposes of her file. She did not file for emergency protective DCS custody because the Child was already in Mother's custody due to a protective order. She agreed that she did not interview Father in her investigation of the case and that the photographs she observed did not show the Child's face. She acknowledged that DCS later overturned her classification and marked the allegation of physical abuse as "unsubstantiated."

Mother confirmed her discovery of the bruising on July 17 after she retrieved the Child from Father's care. She identified the photographs she took depicting the bruising. She stated that she then took the Child to the emergency room at Vanderbilt and that she later entered into an agreed order with Father limiting his visitation. Mother recalled that the Child was initially "okay" after his supervised visitation with Father in 2022 but that he "cried all the way home" and was worried that she would leave him. She testified concerning similar bouts of agitation following his subsequent visits with Father.

Mother testified that she and the Child live with Stepfather and their son in a 3-bedroom, 1-bath house on a 40-acre farm owned by her great-grandmother. She claimed that the Child was bonded with Stepfather, whom she described as follows:

He plays the dad role in [the Child's] life. He takes him to CrossFit. He plays basketball with him. [The Child] is in basketball now, so they go to practice. He [] helps him do boy things outside that I don't enjoy doing. They're building a play set right now or jungle gym for Christmas.

She confirmed that she and Stepfather could provide for the Child financially.

Stepfather expressed his love for the Child and his intent to adopt him should he become available for adoption. He described a loving relationship between himself and the Child. He acknowledged that he has two additional children from another relationship. He explained that he shares equal co-parenting time with their mother and that he speaks with them on the telephone when he is unable to visit because they live in Murfreesboro.

Dreama Howard, a family specialist at Insightful Therapy, testified that she also serves as a social counselor with the Department of Health working with families and children. Prior to her current position, she worked for DCS as a case manager for eight years. As pertinent to this appeal, she supervised Father's visitation in October 2022 and

again in January, March, and April 2023, for a total of four visits. She recalled that the Child was not responsive toward the Father at the beginning of their first visit in October 2022, despite Father's efforts at engaging with him. The Child became more relaxed once his siblings joined them for the latter part of the visit.

Ms. Howard testified that the second visit in January 2023 was good. She recalled that the Child "was opening up a little more, conversing a little more" and was "engaging a little more" with Father. She stated that this improvement carried on into the third visit in March 2023 and that the Child appeared the most comfortable at the April 2023 visit with Father and only one sibling. She explained that Father was guiding and directing the Child in appropriate ways and that the visit went "really well." She recalled that the Child interacted well with his sibling and that they had a very good time together. As to the Child's relationship with Father, she believed that they had an established bond and that their bond was improving as visitation progressed. She did not observe any safety concerns between the Child and Father during visitation.

Ms. Howard testified that her supervision cost was $75 per hour and that the first visit in October 2022 was two hours, while the other three visits were only one hour in duration at Father's request. She provided that visitation was scheduled by the non-custodial parent via telephone and that she worked to accommodate the visitor's schedule.

Stepmother testified that she lives with Father and their six children.[2] She and Father have full legal custody of her biological children, and Father maintains full custody of his two daughters. She described a loving home and a good relationship between Father and the Child. She claimed that the Child also enjoyed a loving bond with his siblings. She believed the visitation in Summer 2021 went well and could not recall anything happening to the Child during his time in their home. She denied ever observing any unusual bruising or anything out of the ordinary bumps and bruises that he would obtain from playing. She explained that they do not spank or use any type of corporal punishment. She did not observe Father engaging in that type of discipline with the Child during the pertinent time period. She described Father as follows:

> He is the most loving, patient, kind person I've ever met. He has so much grace in him for others. He teaches the kids and myself about life and how to enjoy life to the fullest every day. He's strong and teaches our children how to be strong, independent and responsible. He's a very honest man.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory ground of abandonment by failure to visit but was insufficient to sustain the remaining two grounds of severe child abuse and failure to

---

[2] Stepmother and Father share two children, while she has two children from a previous relationship and he has three children from a previous relationship.

manifest an ability and willingness to assume custody of the Child. In so finding, the court explained that it did not find Father's testimony credible that he was unable to afford visitation and that even if regular visitation was unaffordable, then Father still failed to avail himself of regular visitation via FaceTime. The trial court further found that the Child had been abused while in Father's care but that the abuse was not severe for purposes of the statute. The court found that termination of Father's rights was in the best interest of the Child. This appeal followed.

## II. ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A. Whether clear and convincing evidence supports the trial court's finding of one statutory ground for termination.

B. Whether clear and convincing evidence supports the trial court's finding that termination was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the

truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359t, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

As indicated above, the trial court granted the termination petition based upon the statutory ground of abandonment by failure to visit. The trial court rejected the two additional grounds alleged by Mother, namely severe child abuse and failure to manifest an ability and willingness to assume custody of the Child. Mother offers argument suggesting that the trial court erred in its rejection of the two additional grounds. However, she does not request reversal of the trial court's findings. Accordingly, we will simply consider the one ground of termination applied by the trial court as required by our Supreme Court. *In re Carrington H.*, 483 S.W.3d at 525–26 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.").

### Abandonment by failure to visit

Parental rights may be terminated for abandonment when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the affirmative defense to prove by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019).

Here, the petition was filed on February 16, 2022. The relevant four-month period is from October 16, 2021, through February 15, 2022. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day petition was filed). The trial court found that Father had abandoned the Child by his failure to visit, having not seen the Child during the pertinent time period and only providing evidence of one FaceTime visit.

There is no dispute that Father did not visit the Child in the four months immediately preceding the filing of the petition to terminate his parental rights. Father did not plead a lack of willfulness in his answer to the petition; however, the trial court permitted evidence of Father's alleged inability to afford the supervised visitation. Father claimed a cost in excess of $800 for supervised visitation. The record simply does not support this claim. We find no reason to expense two nights in a hotel for one, four-hour visit. Further, Ms. Howard testified that she was willing to work with any client's schedule, thereby obviating the need for Father to take time off work or to find childcare for the remaining children. While we agree that a four-hour visit would cost $300, Father was not required to pay for four hours. Indeed, he never visited for a full four hours once he did finally find time to visit the Child. The record further reflects that Father and Stepmother were employed during the time period and had various streams of income. We, like the trial court, find his testimony unconvincing that he was unable to afford visitation. Father also did not request a visit when he was already present in Tennessee for court proceedings on two separate days in August 2021. Moreover, Father was also permitted to visit via FaceTime, an avenue of visitation he only exercised once during the pertinent time period. With all of these considerations in mind, we affirm the trial court's determination on this ground of termination.

## B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Father's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then

consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of

circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). With respect to these factors, the Child is bonded with Mother, Stepfather, and his half-sibling. Father did not engage in visitation between July 17, 2021, and October 25, 2022, approximately 15 months. While Father visited prior to the termination hearing, his efforts were simply too little, too late. The record reflects that the Child expressed agitation following the visits and that additional time would be needed to fully cultivate the bond between them. Father's refusal to acknowledge the injury that occurred while in his care evidenced a lack of concern for the Child and his parental role. The trial court concluded, and the record supports, that termination of Father's parental rights would not negatively affect the Child's emotional or psychological condition. The Child's relationships with Father and Stepfather are such that he refers to Stepfather, not Father, as "Dad," which the trial court noted was organic and not a product of any coaching.

We turn next to the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the Child's needs), (R) (involving the health and safety of the home). With respect to these factors, Mother has fulfilled the primary parent role since birth, with only occasional involvement from Father. The court found that the evidence supported a finding that physical abuse had occurred while the Child was in Father's care but that the abuse did not rise to the level of severe. The trial court concluded a traumatic event involving abuse occurred at Father's home that damaged the Child's relationship with Father. We agree with the trial court. Father's blatant denial of the injury and failure to take action to prevent future reoccurrence is concerning. Questions remain as to the safety of Father's home.

Next, we consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the Child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Many of these factors are inapplicable because DCS was not fully involved. Father's failure to acknowledge the injury that occurred while in his care and to either accept responsibility or attempt to locate the source of the injury evidenced a lack of effort on his part to meet the Child's needs.

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Father remitted child support during the custodial episode and was able to financially provide for the Child while in his care.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination by clear and convincing evidence. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Father's parental rights was in the Child's best interest.

## V.    CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Darrius C.

_____
JOHN W. McCLARTY, JUDGE

- 13 -